IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**WILLIAM MATTHEWS,**                          Case No. 1:17 CV 2431

     Plaintiff,

     v.                                Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                        MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff William Matthews ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for further proceedings consistent with this opinion.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in April 2011, alleging a disability onset date of March 21, 2013. (Tr. 346-55).[1] His claims were denied initially and upon reconsideration. (Tr. 301-09). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 313-14). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at the hearing before

---

1. Plaintiff previously applied for, and was denied, DIB in a decision dated March 20, 2013. (Tr. 188-214).

the ALJ on May 3, 2016. (Tr. 84-124). On September 8, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 23-34). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on November 21, 2017. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1963, Plaintiff was 49 years old on his alleged onset date, and 52 at the time of the ALJ hearing. *See* Tr. 222. He had a high school diploma and completed two years of college. *See* Tr. 381. Plaintiff last worked in 2009 and left that job after being laid off. (Tr. 120).

Plaintiff testified he believed he was disabled because he could not perform the "general motions of physical labor" due to his right arm, left leg, and left eye impairments. (Tr. 92). Plaintiff had acute retinal necrosis, which destroyed the vision in his left eye and affected his depth perception. (Tr. 92-93). Plaintiff's leg and arm impairments stemmed from an accident in which he was hit by a motorcycle. (Tr. 99). Plaintiff had nerve damage in his right arm (elbow to wrist), limited range of motion, and numbness in his fingers. (Tr. 93-94). He testified this was ongoing, and no worse or better, since 2008. (Tr. 95); *see also* Tr. 96-99 (discussing limitations).

Plaintiff also testified to functional limitations with his left leg. (Tr. 99-102). He had leg pain he rated as five out of ten on an average day with medication, nine without. (Tr. 104-05). He had "metal in there" from his knee to ankle after a fracture in three places; he also had nerve damage. (Tr. 99). Plaintiff was unable to run or jump, and experienced weakness if he stood too long. (Tr. 99-100). He estimated he could stand for fifteen minutes before having to sit, and walk for fifteen to twenty minutes before having to rest. (Tr. 100-01). Plaintiff had a cane at the hearing,

which he testified Dr. Judith Weiss prescribed approximately three years prior. (Tr. 101, 120-21). He always used it outside the house, and sometimes inside. (Tr. 101-02). Plaintiff testified the cane was to "relieve pressure", rather than for balance; but, it also helped with his balance, which was sometimes unsteady due to his eye impairment. (Tr. 102). Plaintiff estimated he could sit for approximately forty-five minutes. (Tr. 102-03).

Plaintiff also testified that his anxiety, depression, and agoraphobia affected his ability to work. (Tr. 107). By way of example, he explained that he had missed buses just to avoid getting on if the bus was crowded. *Id.* Plaintiff testified he had experienced agoraphobia since he was young. *Id.* He avoided going out in public and shopped at odd hours with his sister to avoid a crowd at the grocery store. (Tr. 108). Plaintiff testified he previously picked jobs due where he did not have to be around crowds, and left jobs in the past due to his agoraphobia. (Tr. 109) ("[I]t was a . . . third shift job, but there [were] too many people in there. It was a good job but I just had to get out[.]"). He had difficulty interacting even one-on-one with people. (Tr. 110).

Due to his depression, which was originally diagnosed in 1999, Plaintiff spent a few days per week in bed. (Tr. 111). He saw both a psychiatrist and a therapist. (Tr. 112). Plaintiff's anxiety was triggered by interacting with others, crowds, and insomnia with racing thoughts. (Tr. 113).

At the time of the hearing, Plaintiff was taking (among other things) Naproxen for pain, Viibryd for depression and anxiety, Lunesta for sleep, Trazodone for sleep, Seroquel for anxiety and sleep, and Propranolol for a racing heart and anxiety. (Tr. 105-06).

The ALJ asked Plaintiff if things had worsened since March 2013, and Plaintiff responded: "No, it just – there's no solution for the pain. It just won't go away. And from what I hear from my doctors, pretty much all is done that they can do." (Tr. 121).

Relevant Medical Evidence

*Physical Health*[2]

Prior to the alleged onset date in this case, Plaintiff was in an accident where a motorcycle hit him. *See* Tr. 100, 731. He fractured in his left leg and right arm, requiring surgical repair. (Tr. 99-100); *see also* Tr. 702.

In April 2013, Plaintiff complained of pain in his tibia if he walked more than fifteen minutes. (Tr. 731). He used a cane. *Id.* Judith Weiss, M.D., assessed chronic left leg pain, and ordered an x-ray and vascular studies. (Tr. 733-34).

Plaintiff returned to Dr. Weiss in May 2013. (Tr. 698-701, 714-18). Dr. Weiss again noted Plaintiff had left leg pain after fifteen minutes of ambulation. (Tr. 714). Dr. Weiss thought Plaintiff might have a vascular insufficiency, but she first referred him to orthopedics. *Id.*; Tr. 718. On examination, Plaintiff's gait was normal. (Tr. 717). Dr. Weiss assessed, *inter alia*, chronic leg pain. (Tr. 718). She ordered x-rays and a repair for Plaintiff's cane. (Tr. 698). X-rays showed intact surgical hardware from surgeries with no acute fracture or dislocation. (Tr. 702). He had bony deformities of the proximal tibia and fibula, related to the healed fracture. *Id.*

In May 2013, Plaintiff saw Michael Reich, M.D., in orthopedics. Plaintiff reported chronic left leg pain, explaining that his leg did not bother him at rest, but he had shin pain after exertion. (Tr. 708). Plaintiff also told Dr. Reich his pain was grossly unchanged since the acute post-injury period; he did not require pain medication. *Id.* On examination, Dr. Reich noted Plaintiff had well-healed surgical scars, mild tenderness to palpation over incisions, and painless knee range of

---

2. Plaintiff's argument about his physical limitations focuses solely on his use of a cane. (Doc. 14, at 13-14). Therefore, although Plaintiff had treatment for other physical impairments—most notably his arm/elbow—during the relevant period, the undersigned summarizes only the records relevant to Plaintiff's argument. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).

motion. (Tr. 709). Dr. Reich noted Plaintiff had "[m]ild persistent pain in [his left lower extremity . . . that is only a problem with moderate activity levels and does not cause discomfort/pain at rest." (Tr. 709-10). He thought Plaintiff would likely have persistent chronic pain and referred him to physical therapy for strengthening. (Tr. 710); *see also* Tr. 697 (physical therapy referral).

Plaintiff began physical therapy in June 2013. (Tr. 755). Plaintiff reported chronic pain since his injury, which increased with walking for more than ten to fifteen minutes. (Tr. 756). He described pain of five to six out of ten, which was constant, but varied in intensity. (Tr. 757). He took Neurontin with minimal relief. (Tr. 756). On examination, the therapist noted Plaintiff had poor hip/core strength, poor hamstring and quadricep/hip flexor flexibility, and decreased sensation over his proximal tibia. (Tr. 758). Plaintiff's gait was: "Independent without an assistive device (though ambulates carrying straight cane, decreased L stance time, slow and antalgic)". *Id.* The therapist recommended physical therapy once or twice per week for six to ten visits. *Id.*

At a June appointment, Charlotte Wagamon, M.D., in orthopedics noted Plaintiff walked with a cane. (Tr. 742). At a later June physical therapy visit, Plaintiff reported using a straight cane walking further than twenty feet but did not use it in the house. (Tr. 781). In July, the therapist noted Plaintiff ambulated with a straight cane, and that he used it when he had to walk more than twenty feet. (Tr. 863-64). Plaintiff started physical therapy with "mild" left lower extremity pain and tolerated therapy. (Tr. 864).

In August, Plaintiff returned to orthopedics and saw Anna Wallace, M.D. (Tr. 936). Dr. Wallace noted that Plaintiff had made "some progress" in physical therapy but reported little symptom improvement. *Id.* On examination, Dr. Wallace found reduced range of motion, full strength, and medial joint line tenderness. *Id.* Dr. Wallace suspected the tenderness stemmed from osteoarthritis in the medial compartment of the knee. *Id.* She prescribed Naproxen and instructed

Plaintiff to follow up in six weeks if he had no relief. *Id.* She stated she would "consider injection versus advanced imaging at that time" and might refer Plaintiff to pain management. *Id.*

Plaintiff followed up with orthopedics in September, reporting minimal relief from Naproxen. (Tr. 1009). Lorraine Stern, M.D., noted mild medial joint line tenderness, and that Plaintiff was very tender to palpation on the medal tibial shaft. *Id.* She referred Plaintiff to pain management. (Tr. 1010). At a September 2013 mental health visit, a provider noted Plaintiff had a normal gait. (Tr. 1236).

In October 2013, Plaintiff saw pain management resident physician Vincent Desai, M.D. (Tr. 1049-54). Plaintiff reported he could sit for more than an hour, stand for more than an hour, and walk for twenty minutes. (Tr. 1050). Plaintiff had a normal neurologic examination, including normal sensation, normal motor strength, and normal gait. (Tr. 1053). He had pain to the touch and allodynia over his left leg scars. *Id.* Dr. Desai's plan was smoking cessation, a bone scan, Mobic, and continuing Neurontin. (Tr. 1053-54). Kutalba Tabbaa, M.D., oversaw Dr. Desai and agreed with this plan. (Tr. 1054-55). Dr. Tabbaa noted Plaintiff had pain deep in his leg after two minutes of walking, and that the pain sometimes interfered with sleep. (Tr. 1054).

Plaintiff underwent a bone scan of his left leg in December 2013. (Tr. 1092). It showed some evidence of prior traumatic injuries and repair and degenerative change, but nothing "to confirm a diagnosis of RSD." *Id.*

In January 2014, Plaintiff saw Darlene Brown, R.N., in pain management, describing sharp, crampy burning left leg pain, worse at night and with walking. (Tr. 1105-06). Plaintiff had normal reflexes, sensation, motor strength, and gait. *Id.* Ms. Brown "[r]einforced [the] importance of [a] regular program of improving strength and flexibility", prescribed an increased dosage of Mobic, and prescribed Trazodone. (Tr. 1106).

At a February 2014 visit with Dr. Weiss, Plaintiff reported ongoing pain in his left tibia. (Tr. 1182). Dr. Weiss discussed acupuncture and acupressure, but Plaintiff was not interested. *Id.* On examination, Dr. Weiss noted Plaintiff had a "splinting" gait and used a cane. (Tr. 1185).

In June 2014, Plaintiff sought treatment for left lower leg pain with Eileen Coppola, C.N.P, in pain management. (Tr. 1243-47, 1290-92). Plaintiff reported intermittent aching pain, worse at night and with walking. (Tr. 1290). Ms. Coppola prescribed Diclofenac and Lidocaine (Tr. 1243, 1291-92), and instructed Plaintiff to stop taking Mobic, Naproxen, and Neurontin (Tr. 1243-44). Later in June, Plaintiff returned to Dr. Weiss's office, reporting his pain was not improved, but not worse. (Tr. 1289). Christl Howze, P.A., assessed, *inter alia*, chronic leg pain. *Id.*

A December 2014 x-ray, performed due to pain, showed a healed tibia fracture "with some residual fracture deformity". (Tr. 1644).

Plaintiff returned to Dr. Patterson in orthopedics in April 2016. (Tr. 1832). Dr. Patterson noted Plaintiff was "doing reasonably well" but that he reported pain in the medial aspect of the left knee, worse with activity, somewhat better with Naproxen. *Id.* On examination, Dr. Patterson noted Plaintiff walked "with a mild antalgic gait pattern favoring the left leg". *Id.* Plaintiff's knee range of motion was 0-125 degrees, and he had no instability. *Id.* Dr. Patterson noted x-rays showed "excellent osseous healing of the left tibial fracture" with no sign of hardware loosening. *Id.* Dr. Patterson opined Plaintiff's pain may be due to varicose veins, and prescribed TED hose. *Id.*

Notes in Plaintiff's mental health treatment records from November 2013 through January 2016 indicate Plaintiff had a "ha[d] cane for site [sic] with him" (Tr. 1224, 1225, 1227, 1229, 1231, 1233), "ha[d] cane with him" (Tr. 1452, 1454, 1457, 1723, 1725, 1727), and "ambulate[d] via cane" (Tr. 1820).

*Physical Health Opinion Evidence*

In October 2014, state agency physician Maureen Gallagher, D.O., M.P.H., reviewed Plaintiff's records and opined he could perform the requirements of light work, with postural limitations (never climbing ladders/ropes/scaffolds, occasional stooping, kneeling, crouching, and crawling), limited left field of vision, and avoid exposure to hazards (no commercial driving or unprotected heights). (Tr. 242-44). Dr. Gallagher noted "the RFC given is an adoption of the ALJ RFC dated 3/20/13. The RFC is being adopted under AR 98-4." (Tr. 244).

In February 2015, state agency physician Michael Delphia, M.D., reviewed Plaintiff's records and offered a similar opinion, but noted Plaintiff's depth perception was limited, and he should be precluded from jobs requiring binocular vision. (Tr. 258-60). He again noted the RFC was an adoption of the prior RFC. (Tr. 260).

*Mental Health*

Plaintiff had regular mental health treatment through the Free Clinic of Cleveland during the relevant period. *See* Tr. 1222-37, 1438-58, 1722-28). He also discussed these conditions with his primary care providers. *See, e.g.,* Tr. 717, 731.

In September 2013, Plaintiff complained of anxiety and insomnia to Elizabeth Baker, M.D. (Tr. 1235-37). Dr. Baker noted Plaintiff avoided having to be around people because he "thinks people are looking at him", and was "hypervigilant about people wanting to hurt him". (Tr. 1235). He had a depressed mood (self-rated at five out of ten) and reported panic attacks. *Id.* Dr. Baker noted Plaintiff's mood was "[n]ot too good", his affect restricted, and his thought content mildly delusional. (Tr. 1236). She noted his appearance was neat, his behavior organized and cooperative, his activity normal, his speech clear and distinct, and his though process linear and organized. *Id.* His perception, cognition, insight, and judgment were intact. *Id.* Dr. Baker noted she would wean

Plaintiff off Remeron, continue Doxepin and Cymbalta, and start Seroquel. *Id.* Dr. Baker offered a therapy referral but Plaintiff declined. (Tr. 1237) ("States he tried therapy and it did not work.").

Plaintiff saw Dr. Baker twice more in 2013. *See* Tr. 1231-34. He continued to report depression of five to seven out of ten. (Tr. 1231, 1233). He also continued to hear people calling his name, though in December, no longer felt like people were out to get him or laughing at him on the bus. *Id.* His affect was blunted (Tr. 1233) or constricted, with "constant negative thoughts about everything" (Tr. 1231). His attitude was calm and cooperative, and he denied suicidal or homicidal ideations. (Tr. 1231, 1233). In December his anxiety was "better", and he was trying to walk in the afternoon and listen to the radio; he reported difficulty concentrating. (Tr. 1231). Medications included Seroquel, Cymbalta, and Abilify. (Tr. 1232, 1234).

During the first half of 2014, Plaintiff saw Dr. Baker four times. (Tr. 1223-30). He continued to report depressed mood of five to seven out of ten, and had a constricted affect with constant negative thoughts. (Tr. 1224, 1226, 1227, 1230). He experienced some increasing paranoia, such as looking out the curtains at home to make sure no one was coming in, hearing people call his name, and the return of thoughts that people on the bus were out to get him or laughing at him. *See* Tr. 1223-30. In April, Plaintiff reported a panic attack on an overcrowded bus, and passive thoughts of death. (Tr. 1225). In May, Plaintiff reported good concentration, the ability to perform activities of daily living, and had enjoyed going to his mother's house for half a day. (Tr. 1223). At this visit, Dr. Baker noted Plaintiff "appear[ed] to have a brighter affect, moving fast, and has more reactivity". (Tr. 1224). She noted Plaintiff's medication "seem[ed] to be helping however, he doesn't perceive it to be." *Id.* In March, Plaintiff was taking Seroquel and Cymbalta, but weaning Abilify. (Tr. 1228). In May, he continued Seroquel at an increased dose, and took Effexor in place of Cymbalta. (Tr. 1224).

From July to December 2014, Plaintiff saw Sarah Engle, M.D. (Tr. 1449-58). During this time, Plaintiff's mood was depressed at a level of six out of ten (Tr. 1450, 1452), "terrible" (Tr. 1453-54), and dysthymic (Tr. 1457). He continued to have panic attacks around crowds (Tr. 1449), and throughout this time period was noted to be hypervigilant in public places (Tr. 1449, 1452, 1454, 1457). His attitude was consistently calm (Tr. 1450, 1452, 1454, 1457), at times pleasant and engaged (Tr. 1450, 1452), and at other times, irritable and frustrated at not getting better (Tr. 1454, 1457). In July, Plaintiff reported feeling like he "hit a wall" and returning to where he began before he started feeling better. (Tr. 1449). In August, he reported things were "not getting better, but not getting worse." (Tr. 1451). In December, Dr. Engle noted Plaintiff had run out of medication after missing his prior two appointments. (Tr. 1456). At that appointment, Dr. Engle restarted Plaintiff on his medications (Effexor and Latuda), and discontinued Ambien, and started Trazodone. (Tr. 1457). From September 2013 through May 2014, Plaintiff declined a referral to therapy, stating he had tried it in the past and it did not help. *See* Tr. 1224, 1226, 1228, 1230, 1232, 1234. In July, he stated he was willing to try (Tr. 1450), and in September and December, he stated he would like to start with "Dr. Bailey." (Tr. 1455, 1458).

Plaintiff continued to treat with Dr. Engle in 2015. *See* Tr. 1722-28. In January 2015, Dr. Engle noted Plaintiff was "brighter" as compared to previous visits, though his mood was still constricted, with "constant negative thoughts." (Tr. 1723). Plaintiff also reported that meeting with Dr. Bailey was helpful. (Tr. 1722). Dr. Engle noted: "Objectively, his affect is brighter and he is more talkative compared to previous sessions. I suspect the combination of initiating therapy and restarting his meds has been helpful." (Tr. 1723).

At three visits in 2015, Dr. Engle continued to note Plaintiff was hypervigilant in public places. (Tr. 1723, 1725, 1727). In February, he reported an anxiety attack getting on a crowded

bus, and that he continued to self-isolate. (Tr. 1724). Dr. Engle continued, and increased dosages of Effexor and Latuda during this time; she also prescribed, at various times, Ambien, Prazosin, and Trazodone. *See* Tr. 1723, 1725, 1728.

The final mental health treatment note in the record is from January 2016. (Tr. 1819-21). Anmol Tolani, M.D., noted Plaintiff was last seen by Dr. Engle in November, at which point his Viibryd prescription was increased. (Tr. 1819). Plaintiff reported he was "doing a little better" with his depression but continued to have difficulty sleeping and anxiety. (Tr. 1820). His anxiety "remain[ed] an issue when he gets on the bus or is in a crowded place." *Id.* He was calm and cooperative, mildly depressed, with a restricted affect; his though process was linear and logical, and he denied suicidal or homicidal ideations. *Id.* He denied hallucinations but continued to have anxiety in public places. *Id.* Dr. Tolani noted Plaintiff's inconsistent use of Seroquel and his CPAP machine, and Dr. Tolani encouraged Plaintiff to do both nightly. (Tr. 1821). Her impression was major depressive disorder, and panic disorder with agoraphobia. *Id.* She continued Plaintiff's medications (Vilazadone, Seroquel, and Propranolol (for panic attacks)). *Id.*

### Mental Health Opinion Evidence

In August 2014, Dr. Engle completed a medical source statement form regarding Plaintiff's mental capacity. (Tr. 1436-37). She opined Plaintiff could only rarely[3]: deal with the public; work with or in proximity to others without being distracted; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and socialize. *Id*. Plaintiff could occasionally[4]: relate to co-workers; deal with work stress; behave in an emotionally stable manner;

---

3. The form defined "rare" as "activity cannot be performed for any appreciable time". (Tr. 1436).
4. The form defined "occasional" as "ability for activity exists for up to 1/3 of a work day." (Tr. 1436).

relate predictably in social situations; manage funds/schedules; and leave home on his own. *Id.* Plaintiff could frequently[5]: maintain attention and concentration for extended periods of 2-hour segments; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerance; function independently without redirection; work in coordination with or proximity to others without being distracting; understand, remember, and carry out simple, detailed, or complex job instructions; and maintain his appearance. *Id.* He could constantly[6] follow work rules or use judgment. (Tr. 1436). Finally, in the category of interacting with supervisors, Dr. Engle wrote "unknown" in the "frequent" column. *Id.* She noted Plaintiff had been in her practice's care for four years, and had diagnoses of major depressive disorder and panic disorder with agoraphobia. (Tr. 1437). Specifically, she noted he had "extreme difficulty being around others due to these conditions." *Id.*

In October 2014, state agency psychologist Aracelis Rivera, Psy.D., reviewed Plaintiff's records. (Tr. 244-45). Dr. Rivera opined Plaintiff was moderately limited in his ability: 1) to interact with the general public; 2) accept instructions/respond appropriately to criticism from supervisors; and 3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* Dr. Rivera also opined Plaintiff was not significantly limited in the ability to ask simple questions, request assistance, or maintain socially appropriate behavior, or adhere to basic standards of neatness and cleanliness. *Id.* Dr. Rivera noted this RFC was an adoption of the prior RFC and was "being adopted under AR 98-4." (Tr. 245).

In February 2015, state agency psychologist Deryck Richardson, Ph.D., reviewed Plaintiff's records and affirmed Dr. Rivera's opinion. (Tr. 260-61).

---

5. The form defined "frequent" as "ability for activity exists for up to 2/3 of a work day." (Tr. 1436).
6. The form defined "constant" as "ability to perform activity is unlimited. (Tr. 1436).

<u>ALJ Decision</u>

In his written decision dated September 8, 2016, the ALJ found Plaintiff met the insured status requirements for DIB through September 30, 2014, and had not engaged in substantial gainful activity since March 21, 2013 (his alleged onset date). (Tr. 25). He found Plaintiff had severe impairments of left eye blindness due to retinal necrosis; left eye cataract after surgery; residual effects of fractures in the right radius and ulna after open reduction and internal fixation; residual effects of an ankle fracture; residual effects of a right fifth metacarpal fracture; depressive disorder, not otherwise specified; panic disorder; personality disorder; and alcohol abuse. *Id.* However, none of these impairments – singly or in combination – met or medically equaled a listed impairment. (Tr. 26). The ALJ then concluded Plaintiff had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with restrictions. Specifically, he is able to lift, carry, push and pull up to 20 pounds occasionally and 10 pounds frequently. In an 8-hour workday, he can sit, stand and/or walk for 6 hours each, with normal breaks. He cannot use ladders, ropes or scaffolds, but can occasionally use ramps and stairs. He can occasionally stoop, kneel, crouch and crawl. He is precluded from jobs requiring binocular vision. He must avoid all exposure to workplace hazards and is precluded from occupational driving. He is limited to tasks that are low-stress, not in public, and that involve no interaction with the public and no more than superficial interaction with co-workers and supervisors. He is precluded from tasks involving arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

(Tr. 27). The ALJ explained this was an adoption of the RFC from Plaintiff's prior disability claim pursuant to Social Security Acquiescence Ruling 98-4(6) and *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997). *See id.* The ALJ then found Plaintiff was unable to perform any past relevant work (Tr. 32), and considering his age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform (Tr. 33). Therefore, the ALJ found Plaintiff was not disabled. (Tr. 34).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred in two ways. First, he contends the ALJ erroneously applied *res judicata* when he adopted a previous ALJ's RFC determination. (Doc. 14, at 13-15). Second, he contends the ALJ erred in his consideration of Dr. Engle's opinion. *Id.* at 15-22. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed. (Doc. 15, at 10-17).[7] For the reasons discussed below, the undersigned reverses and remands for further proceedings.

---

7. The Commissioner also filed a Notice of Additional Authority, contending that the Sixth Circuit's intervening decision in *Earley v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 2018), does not change this analysis.

<u>Treating Physician Rule</u>

Plaintiff argues the ALJ erred in his evaluation of Dr. Engle's opinion. Specifically, he contends the ALJ unreasonably rejected Dr. Engle's opinion regarding Plaintiff's social interaction abilities. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed. For the reasons discussed below, the undersigned remands for further consideration and explanation of the weight assigned to Dr. Engle's opinion.

In general, medical opinions from a treating source are given more weight than those from a non-treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Medical opinions are defined as "judgments about the nature and severity of [the claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).

The treating physician rule requires the ALJ to assign a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinic and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c), 416.927(c)[8]; *Turk v. Comm'r of Soc. Sec.*, 647 F. App'x 638, 640 (6th Cir. 2016). Where an ALJ does not give controlling weight to a treating source opinion, he weighs that opinion using the factors in 20 C.F.R. §§ 404.1527(c)(2)-(6); 416.927(c)(2)-(6). This does not require an "exhaustive, step-by-step analysis," but merely "good reasons" for the

---

8. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

ALJ's weighing of the opinion. *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017) (citation omitted). These good reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion, and the reasons for that weight." SSR 96-2p, 1996 WL 174188, at *5.

As the Sixth Circuit explained in a recent decision:

* * * The justification for this requirement is two-fold: (1) it helps a claimant to understand the disposition of her case, especially "where a claimant knows that h[er] physician has deemed h[er] disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544. We have been clear that we will remand "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [that] we will continue remanding when we encounter opinions from ALJ's that do not *comprehensively* set forth the reasons for the weight assigned to a treating physician's opinion." *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (emphasis added) (quoting *Wilson*, 378 F.3d at 545).

Remand is not necessary, however, if the ALJ's failure to provide good reasons is a "harmless *de minimis* procedural violation." *Blakley*, 581 F.3d at 409. Although we have yet to define "harmless error" in this context, we have identified three situations in which it might occur: (1) where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) where "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," and (3) "where the Commissioner has met the goal of ... the procedural safeguard of reasons." *Wilson*, 378 F.3d at 547. With respect to the last of these circumstances, "the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir. 2010). That said, "[a] procedural error is not made harmless simply because [the claimant] appears to have ... little chance of success on the merits[,]" *Wilson*, 378 F.3d at 546 (quoting *Mazaleski v. Treusdell*, 562 F.2d 701, 719 n.41 (D.C. Cir. 1977) ); and where the error makes meaningful review impossible, the violation of the good-reasons rule can never qualify as harmless error, *Blakley*, 581 F.3d at 409.

*Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 438 (6th Cir. 2018).

Application of this standard dictates reversal in this case. Dr. Engle opined Plaintiff could only "rarely": deal with the public; work with or in proximity to others without being distracted;

complete a normal workday and workweek without interruption from psychologically based symptoms; and socialize. (Tr. 1436-37). She opined Plaintiff could "occasionally": relate to co-workers; deal with work stress; behave in an emotionally stable manner; relate predictably in social situations; manage funds/schedules; and leave home on his own. *Id.* These findings conflict with the ALJ's RFC determination finding Plaintiff could complete a normal workday and workweek and engage in superficial interaction with co-workers and supervisors. *See* Doc. 15, at 13 (Commissioner's brief noting that Dr. Engle's opinion "suggested disabling-level mental impairments").

In his opinion, the ALJ summarized Dr. Engle's opinion, and then explained, *in toto*: "This opinion is from a treating physician who saw the claimant for 4 years, however it is not supported with explanation or evidence, and is given partial weight in the decision." (Tr. 31). Although analysis of a treating physician's opinion can be brief and still satisfy the "good reasons" requirement, *see Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), the Court finds the ALJ's explanation here insufficient because it is not "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion, and the reasons for that weight." SSR 96-2p, 1996 WL 174188, at *5.

First, contrary to the ALJ's determination, Dr. Engle's opinion did offer some (albeit brief) explanation for the opined restrictions. *See* Tr. 1437 (noting diagnoses of major depressive disorder and panic disorder with agoraphobia and that Plaintiff "has extreme difficulty being around others due to these conditions.").

Second, the ALJ stated he assigned the opinion "partial" weight. (Tr. 31). That is, he seemingly credited the opinion to some extent, despite his rationale that it was "not supported with

explanation or evidence". (Tr. 31). There is no explanation for why some of Dr. Engle's restrictions were adopted and others were not.

Third, the Commissioner's attempts to further translate and interpret the ALJ's single sentence explanation cross the line from applying the substantial evidence standard into the prohibited territory of *post hoc* reasoning. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency). Specifically, the Commissioner argues that "[i]n other words, the ALJ concluded the opinion as not supported with medical evidence or consistent with other evidence in the record." (Doc. 15, at 14). But this is not what the ALJ said. The ALJ simply stated the opinion itself was "not supported with explanation or evidence" (Tr. 31); he did not say it was inconsistent with other evidence in the record. Perhaps in an attempt to remedy this apparent leap of logic, the Commissioner points to the ALJ's earlier discussion of Plaintiff's mental impairments. (Doc. 15, at 15). At step three, the ALJ summarized his consideration of Plaintiff's mental impairments:

> Concerning the claimant's mental impairments, medical records indicate consistent treatment for depression, anxiety, and panic attacks, with generally moderate symptoms (Exhibits B4F and B10F). Treatment notes from April 2014 report depression rated by the claimant has 7 out of 10, but with some improvement in his panic attacks (Exhibit B14F/2). Treatment notes from December 16, 2014 report that the claimant has missed appointments for 2 months and had discontinued his medication, and was reporting increased symptoms of anxiety and depression (Exhibit B14F/12-13). Treatment notes from January 13, 2015 report that the claimant has been compliant with his medication and reports improvement with his depression, and presented with a brighter affect and more talkative than in previous sessions (Exhibit B1F/16). Treatment notes from January 20, 2016 note the claimant reports he is doing better with his depression, saying he has "feeling of helplessness/hopelessness but reports they are decreased from last time," and that "he has not had any issues with his appetite or energy" (Exhibit B16F/3). The claimant's diagnosis and treatment for depression, anxiety, and agoraphobia is well documented in the medical evidence of record, as are his symptoms, which appear

> to be manageable when the claimant is complaint with his medications and engaged in treatment.

(Tr. 30).

But the ALJ himself did not expressly refer to these treatment records in assigning Dr. Engle's opinion partial weight. *See* Tr. 31. Moreover, even if this analysis were tied to the ALJ's analysis of Dr. Engle's opinion, the other problem with the Commissioner's reliance on this earlier summary to justify the ALJ's treatment of Dr. Engle's opinion is that the statement that Plaintiff's symptoms "appear to be manageable when the claimant is compliant with his medications and engaged it treatment" (Tr. 30) is an overstatement of the record. From September 2013 through September 2014, Plaintiff took medications at doses prescribed and adjusted by Drs. Baker and Engle and continued to report paranoid thoughts, hypervigilance, anxiety and panic attacks in crowds. (Tr. 1224, 1226, 1228, 1230, 1232, 1234, 1236,1450, 1452, 1454). The ALJ correctly cited treatment records from December 2014 and January 2015 when Plaintiff was not medication compliant and improved upon re-starting his medications. *See* Tr. 30 (citing Tr. 1719-20, 1723). However, although Plaintiff was noted to be "brighter" at his January 2015 visit (Tr. 1723), Dr. Engle also continued to note Plaintiff was "more irritable compared to previous visits, seems frustrated that he is not getting better", had a constricted affect, had "[c]onstant negative thoughts about everything, and continued to be hypervigilant in public places. *Id.* And, in two subsequent visits, Dr. Engle noted similar mental status exam findings (Tr. 1725, 1727), and that Plaintiff "continue[d] to isolate in his house" and "had an anxiety attack when getting on the bus and saw the crowds" (Tr. 1724). In February, Dr. Engle noted she would "[c]ontinue Latuda 20 mg daily as adjunct to Effexor for treatment resistant anxiety and depression." (Tr. 1725). In April, Plaintiff had a dysthymic mood, and Dr. Engle continued to adjust his medications ("Increase Latuda to 40 mg daily as adjunct to Effexor for treatment resistant depression (vs. Bipolar depression.")." (Tr.

1728). Although it is for the ALJ and not this Court to weigh and resolve conflicts in the evidence, the ALJ must be careful not to selectively parse the record. *See Minor v. Comm'r of Soc. Sec.,* 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record"); *Germany–Johnson v. Comm'r of Soc. Sec.,* 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). The ALJ's broad statement that Plaintiff's symptoms "appear manageable when the claimant is complaint with his medications and engaged in treatment" (Tr. 30) is based upon a selective reading of the medical record not supported by substantial evidence.

The undersigned finds the ALJ's single-sentence statement about Dr. Engle's opinion – in light of the record as a whole in this case – is not "sufficiently specific to make clear to [this Court] the weight the adjudicator gave to the treating source's medical opinion, and the reasons for that weight." SSR 96-2p, 1996 WL 174188, at *5.[9] There may well be good reasons for discounting Dr. Engle's opinion, but they were not provided by the ALJ here. As such, remand is required for the Commissioner to more comprehensively address this treating source opinion.

Drummond/Earley

Plaintiff also contends the ALJ erred in applying *res judicata* principles. He contends there was a deterioration of his physical health evidenced by the use of a cane, and a deterioration of

---

9. In her brief, the Commissioner offers additional rationales to support the ALJ's decision. *See* Doc. 15, at 14 ("There were no mental status reports, psychological inventory test results, examples of difficulty getting along with others, or any other kind of evidence."); Doc. 15, at 12-13 ([W]hile not mentioned by the ALJ in the hearing decision, it is noteworthy that she specifically asked him during his hearing whether he had the 'same pain and the same problems' he had for the last three years, and she asked him if things had 'gotten worse since say March 2013?' Plaintiff responded that there was no change, but he complained that his ongoing pain remained treatable.") (internal citations omitted). The undersigned offers no opinion on whether these rationales would provide good reasons for the ALJ's evaluation of Dr. Engle's opinion because they were not offered by the ALJ. *See Williams*, 227 F. App'x at 464 (citing *Chenery Corp.*, 332 U.S. at 196).

Plaintiff's mental health evidenced by further social isolation, combined with Dr. Engle's opinion that Plaintiff would have social interaction difficulties. The Commissioner responds that the ALJ was within his "zone of choice" in determining there was no new evidence or changed circumstances to justify modifying Plaintiff's RFC. Additionally, in her supplemental filing, the Commissioner contends that the Sixth Circuit's intervening decision in *Earley v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 2018), does not change this analysis because the ALJ "properly considered the prior decision and considered all of the evidence at hand including newly submitted evidence." (Doc. 16, at 2).

In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d 837, 842 (6th Cir. 1997); *Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 425 (6th Cir. 2015). In that case, the claimant's initial claim for SSI was denied when an ALJ found that the claimant retained an RFC for sedentary work. *Drummond*, 126 F.3d. at 838. When the claimant later re-filed her disability claim, a second ALJ found that the claimant retained an RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim. *Id.* at 839. After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in the claimant's condition. *Id.* at 841-42. "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id.*

In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling 98–4(6), which explained:

This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.

When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

1998 WL 283902, at *3 (footnote omitted).

Subsequent to Plaintiff's appeal to this Court becoming decisional, the Sixth Circuit clarified the scope of *Drummond* in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018). In *Earley*, the Sixth Circuit clarified *res judicata* applies to subsequent applications for "the same period of time [ ] rejected by the first application." *Id.* at 933. The Sixth Circuit further reasoned:

While we are at it, we should point out that issue preclusion, sometimes called collateral estoppel, rarely would apply in this setting. That doctrine "foreclos[es] successive litigation of an issue of fact or law actually litigated and resolved." *Id.* at 748-49, 121 S.Ct. 1808. But human health is rarely static. Sure as we're born, we age. Sometimes we become sick and sometimes we become better as time passes. Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have "actually litigated and resolved" whether a person was disabled at some later date.

All of this helps to explain why *Drummond* referred to "principles of *res judicata*" – with an accent on the word "principles." 126 F.3d at 841-843. What are those principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record. *Id.* at 842, *see Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999). This is why it is fair for an administrative law judge to take the view that,

absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

*Earley*, 893 F.3d at 933. Only a few district courts have applied *Earley*. In so doing, one summarized, and explained:

> Courts applying *Earley* to ALJ decisions issued before that case have asked whether the ALJ, despite purporting to follow *Drummond*, gave the new evidence a fresh look. If so, then the ALJ's decision satisfied *Earley*; if not, then remand was appropriate. *See Snyder v. Comm'r of Soc. Sec.*, No. 1:17-cv-486, 2018 WL 4658813, at *3 (W.D. Mich. 2018) (finding that the pre-*Earley* ALJ decision satisfied *Earely* by "effectively re-open[ing]" the prior ALJ's decision); *Dunn v. Comm'r of Soc. Sec.*, No. 1:17-cv-634, 2018 WL 4574831, at *3 (W.D. Mich. 2018) (reversing where the ALJ did not satisfactorily review the evidence, but rather focused on the prior RFC findings); *Cassaday v. Comm'r of Soc. Sec.*, No. 1:17-cv-630, 2018 WL 4519989, at *3 (W.D. Mich. 2018) (reversing where the ALJ's decision was not consistent with *Earley*'s requirement of independent review); *Brent v. Comm'r of Soc. Sec.*, Case No. 17-12654, 2018 WL 4403418, at *2–3 (E.D. Mich. 2018) (holding that pre-*Earley* ALJ sufficiently conducted an independent review of the evidence and did not simply adopt prior ALJ's findings wholesale); *Kamphaus v. Comm'r of Soc. Sec.*, No. 2:17-cv-11828, 2018 WL 3800243, at *5 (E.D. Mich. 2018) ("It is clear to the Undersigned that ALJ Deming did not simply apply *res judicata* principles and adopt ALJ Kalt's findings 'lock, stock and barrel,' but instead gave new consideration and analysis" to the new evidence.), *rep. & rec. adopted by* 2018 WL 3770045 (E.D. Mich. 2018); *see also Kimball v. Comm'r of Soc. Sec.*, Civil Action No. 17-12659, 2018 WL 4102845, at *5 n. 4 (E.D. Mich. 2018) (finding *Earley* did not change its analysis of pre-*Earley* ALJ decision because ALJ had concluded she was not bound by the previous RFC due to new and material evidence), *rep. & rec. adopted by*, 2018 WL 4095081 (E.D. Mich., 2018).

*Johnson v. Comm'r of Soc. Sec.*, 2018 WL 6440897, at *14-15 (E.D. Mich.), *report and recommendation adopted*, 2018 WL 6434778.

The Commissioner's supplemental filing addresses *Earley*, *see* Doc. 16, and Plaintiff did not respond. But Plaintiff's argument under *Drummond* is similar to one made under *Earley* – he in essence argues the ALJ failed to properly evaluate the new evidence of record of both his physical and mental impairments. The undersigned agrees, for the reasons stated below.

The ALJ here explained that, pursuant to *Drummond*:

> [W]here a final decision on a prior disability claim contains a finding of a claimant's residual functional capacity (RFC), the agency may not make a different finding in adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim unless new and additional evidence or changed circumstances provide a basis for a different finding of the claimants' RVC. It is found that there has been no additional evidence or changed circumstances that would provide a basis for a different finding than the previous finding and [the prior RFC] therefore adopted under Drummond.

(Tr. 27). In concluding his step four analysis, the ALJ stated that "[n]ew evidence fails to show the claimant to be more limited than previously determined." (Tr. 32). That is, the ALJ started from a point of assuming the prior RFC was binding.

*Physical Impairments*

First, Plaintiff contends new evidence showed he required use of a cane, which the ALJ failed to acknowledge. The Commissioner contends the ALJ's decision not to modify the prior RFC to include a cane in the RFC is supported by substantial evidence. For the reasons discussed below, the undersigned also reverses and remands the Commissioner's decision regarding Plaintiff's use of a cane for further consideration under *Earley*.

There is evidence in the record that Plaintiff used a cane. *See* Tr. 101, 120-21 (Plaintiff's testimony that cane was prescribed by Dr. Weiss); Tr. 698 (repair order); *see also* Tr. 731, 758, 742, 781, 1185 (physical health treatment records noting Plaintiff's cane usage); (Tr. 1224, 1225, 1227, 1229, 1231, 1233, Tr. 1452, 1454, 1457, 1723, 1725, 1727, 1820) (mental health treatment records noting Plaintiff's cane usage). The ALJ did not address any of this evidence, nor, aside from mentioning Plaintiff's testimony about the cane, discuss it in his opinion. Plaintiff specifically argues that the repair order "implies the device [was] medically necessary". (Doc. 14, at 13) (citing Tr. 698). The record to which Plaintiff points, from a May 2013 visit with Dr. Weiss, states, under "Orders This Visit": "DME/ MISCELLANEOUS/REPAIR". (Tr. 698). Handwritten next to it is the word "cane". *Id.*

According to the Sixth Circuit, if a "cane [is] not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). For an ALJ to find a hand-held assistive device is "medically required", "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7. Although SSR 96-9p specifically addresses work in the sedentary range, courts have applied this definition in cases involving light work. *See, e.g., Ross v. Comm'r of Soc. Sec.*, 2018 WL 1406826, at *3 (S.D. Ohio); *Barton v. Comm'r of Soc. Sec.*, 2017 WL 6818345, at *17 (N.D. Ohio).

The ALJ in the previous case considered Plaintiff's use of a cane and explained:

> Mr. Matthews has also alleged that he uses a cane for ambulation. He testified that this cane was not prescribed, but belonged to his father. There is no evidence that Mr. Matthews' treating physicians or physical therapists have recommended the use of a cane following the period for healing of his lower extremity fractures. In addition, I note that there is no evidence of reports of treating medical professionals that Mr. Matthews ambulated with a cane during office visits. Therefore, the residual functional capacity above does not contain an allowance for the use of a cane in the workplace.

(Tr. 201). The ALJ in the instant case adopted the prior ALJ's RFC because "there has been no additional evidence or changed circumstances that would provide a basis for a different finding than the previous finding and [it] is therefore adopted under Drummond[.]" (Tr. 27).

As summarized above, however, there appears to be additional evidence in the record regarding Plaintiff's cane usage that contradicts the prior ALJ's findings. First, in contrast to his original testimony that the cane was not prescribed, *see* Tr. 201, at the second hearing Plaintiff testified it was prescribed by Dr. Weiss (Tr. 120-21), and presented evidence that a cane repair was ordered in May 2013 (Tr. 698). Second, in finding the cane not medically necessary, the prior

ALJ noted that there was "no evidence of reports of treating medical professionals that [Plaintiff] ambulated with a cane during office visit" (Tr. 201), whereas in the relevant time period here, such notations were frequent (Tr. 731, 758, 742, 781, 1185) (physical health treatment records noting Plaintiff's cane usage); (Tr. 1224, 1225, 1227, 1229, 1231, 1233, Tr. 1452, 1454, 1457, 1723, 1725, 1727, 1820) (mental health treatment records noting Plaintiff's cane usage).

The Commissioner contends that there was still no evidence that the cane was "medically necessary." But this is a determination for the ALJ to make (and explain), not this Court in the first instance. Thus, while "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application", *Earley*, 893 F.3d at 933, it is not clear that it what happened here, because the ALJ did not discuss Plaintiff's cane usage and any findings related thereto. Without this discussion, it is unclear if the ALJ considered and rejected a cane limitation, or simply adopted the prior ALJ's RFC omitting cane usage without considering the new records.[10] An ALJ must say enough "to allow the appellate court to trace the path of his reasoning." *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). The ALJ did not do so here, and particularly given the intervening decision in *Earley*, requiring an ALJ give "a fresh look to a new application containing new evidence", 893 F.3d at 930, remand is required.

---

10. The Sixth Circuit has explained that "[n]either *Drummond* nor SSAR 98–4(6) require the ALJ to make specific comparisons with the evidence supporting the prior final decision", but rather "the proper inquiry is whether 'new and additional evidence or changed circumstances provide a basis for a different finding of the claimant's residual functional capacity." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 725–26 (6th Cir. 2013) (quoting SSAR 98-4(6), 1998 WL 283902, at *3). Here, however, because the ALJ did not discuss any of the above new evidence regarding cane usage, it is impossible for the Court to determine whether the ALJ considered or overlooked this evidence.

*Mental Impairments*

Plaintiff similarly argues the ALJ erred in not finding evidence of a mental health condition. Because remand is required to address the opinion of Dr. Engle, the undersigned finds it unnecessary to separately address this argument. On remand, in considering Dr. Engle's opinion, the Commissioner should take care to ensure any subsequent analysis complies with the Sixth Circuit's recent pronouncement in *Earley*.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI not supported by substantial evidence and reverses and remands that decision pursuant to Sentence Four of 42 U.S.C. § 405(g)

 s/James R. Knepp II
United States Magistrate Judge